UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

DEION MCCRAE,

                              Petitioner,                    **MEMORANDUM & ORDER**
                                                             11-CV-2581 (MKB)

               v.

SUPERINTENDENT WILLIAM LEE and
ATTORNEY GENERAL OF THE STATE OF
NEW YORK,

                              Respondents.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Petitioner Deion McCrae brings the above-captioned petition pursuant to 28 U.S.C.

§ 2254, alleging that he is being held in state custody in violation of his federal constitutional

rights.  (Pet. for Writ of Habeas Corpus ("Pet."), Docket Entry No. 1.)  Petitioner's claims arise

from a judgment of conviction following a jury trial in the Supreme Court of New York State,

Kings County (the "Trial Court") on charges of murder in the first and second degrees, attempted

murder in the second degree, assault in the first degree and criminal possession of a weapon in

the second degree.  Petitioner was convicted of attempted murder in the second degree and

criminal possession of a weapon in the second degree.  (*Id.* at 5.)  The jury was unable to reach a

verdict on the charges for murder in the first and second degrees and assault in the first degree.

Petitioner was sentenced to a term of twenty-three years of imprisonment for attempted murder

and fifteen years of imprisonment for criminal possession of a weapon, to run concurrently.  (*Id.*)

Petitioner appealed his conviction to the New York Supreme Court Appellate Division, Second

Department (the "Appellate Division").  Petitioner was subsequently retried and acquitted on the

murder charge, after which he requested permission from the Appellate Division to file a

supplemental brief introducing his acquittal as new evidence relating to his convictions. (*Id*. at

5–6.) The Appellate Division denied Petitioner's request. (Decision & Order dated Nov. 18,

2009, Pet. Ex. 4 at 3,[1] Docket Entry No. 1.) The Appellate Division affirmed Petitioner's

conviction. *People v. McCrae*, 895 N.Y.S.2d 101, 103–04 (App. Div. 2010). The Court of

Appeals denied Petitioner's request for leave to appeal the Appellate Division's decision.[2]

*People v. McCrae*, 14 N.Y.3d 842, 842 (2010).

In the instant petition, Petitioner seeks a writ of habeas corpus on the following grounds:

(1) the Trial Court's consolidation of two indictments in which Petitioner was charged with

crimes related to separate incidents violated Petitioner's Fifth and Fourteenth Amendment rights

to a fair trial; (2) the cumulative effect of the Trial Court's evidentiary rulings violated

---

[1] With the exception of certain transcripts, the parties filed the state court record in bundled exhibits annexed to the original petition, the amended petition and Respondent's opposition. Each exhibit contains multiple parts of the state court record, including the parties' briefing and the state courts' decisions. The Court refers to the four exhibits annexed to the original petition as "Pet. Ex. 1" through "Pet. Ex. 4," (Docket Entry No. 1); to the two exhibits annexed to the amended petition as "Am. Pet. Ex. 1" and "Am Pet. Ex. 2," (Docket Entry No. 11); and to the four exhibits annexed to Respondent's affidavit in opposition to the petition as "Resp. Ex. 1" through "Resp. Ex. 4," (Docket Entry No. 5). Because the exhibits are inconsistently paginated, the Court cites the page number assigned by the electronic document filing system ("ECF").

[2] While his direct appeal was pending before the Appellate Division, Petitioner filed a motion before the Supreme Court of New York State, Kings County to vacate his conviction pursuant to section 440.10 of the New York Criminal Procedure Law ("Section 440.10"), which the court denied. (Decision & Order dated Feb. 26, 2010, Pet. Ex. 4 at 5–7.) The Appellate Division denied Petitioner leave to appeal the decision to the Court of Appeals. (Decision & Order dated Jan. 22, 2013, Am. Pet. Ex. 2 at 14.) After filing the instant habeas petition, Petitioner, proceeding *pro se*, filed a second Section 440.10 motion before the Supreme Court of New York State, Kings County, which the court denied. (*Id*. at 12–17.) The Appellate Division denied Petitioner leave to appeal the decision to the Court of Appeals. (Decision & Order dated July 8, 2013, Am Pet. Ex. 2 at 44.) Petitioner, again proceeding *pro se*, moved this Court for permission to amend his habeas petition to add claims based on new evidence. (Motion for Leave to Amend or Supplement Pet. ("Mot. to Suppl. Pet."), Docket Entry No. 10.) The Court granted leave to amend. (Amended Pet., Docket Entry No. 11.)

Petitioner's due process rights under the Fifth and Fourteenth Amendments, as well as his Sixth Amendment right of confrontation; (3) the court that decided Petitioner's first Section 440 motion erred in holding that, by denying Petitioner leave to file a supplemental brief after his acquittal on the murder charge, the Appellate Division made a determination on the merits that Petitioner's acquittal did not constitute new evidence entitling him to a hearing on his motion to vacate his prior convictions; (4) the court that decided Petitioner's first Section 440 motion erred in holding that, notwithstanding the Appellate Division's determination, Petitioner's acquittal for murder in a later trial did not constitute new evidence; (5) newly discovered evidence regarding a cooperating witness reveals that the government knowingly used false or misleading testimony at trial, in violation of Petitioner's right to due process; and (6) the same newly discovered evidence reveals that the government failed to disclose favorable evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), in violation of Petitioner's right to due process. (Pet. at 7–8; Amended Pet. 1–2.) For the reasons discussed below, the petition is denied.

## I. Background

### a. Incident and arrest

The evidence at trial established that on December 19, 2004, at approximately 1:00 PM, the victim, James McCrae,[3] went to the apartment of Latisha Washington,[4] located at 1605 Fulton Street, Brooklyn, New York, in order to provide her with money for their daughter's school fees. (Affidavit in Supp. of Resp. Br. ("Resp. Aff.") 1–2, Docket Entry No. 4.) As the victim stood outside Ms. Washington's home, he was shot in the face. (Resp. Aff. 2.) At the

---

[3] The victim bears no relation to Petitioner. (Affidavit in Support of Respondent's Brief ("Resp. Aff.") 1, Docket Entry No. 4.)

[4] The Court refers to Latisha Washington and her uncle, Corey Washington, as "Ms." and "Mr." Washington, respectively.

hospital, the victim informed the police that he was shot by a man named "Skip," who was involved in a relationship with Ms. Washington.  (Pet. 9.)  Police showed the victim a photographic array, from which the victim identified Petitioner as the individual who shot him.  (*Id.*)  The victim also informed the police that the shooter drove a black Jeep Liberty with New Jersey license plates, for which the police found a rental agreement identifying Petitioner as the renter.  (*Id.*)  On January 25, 2005, the police arrested Petitioner for the shooting.  (*Id.* at 1.)  Petitioner was charged with attempted murder in the second degree, assault in the first, second and third degrees, and criminal possession of a weapon in the second, third and fourth degrees.  (*Id.* at 2.)  The victim testified before a grand jury, identifying Petitioner as the man who shot him.  (Resp. Aff. 2.)

On September 10, 2005, while the charges were pending, the victim was shot multiple times in Brooklyn.  (Resp. Aff. 2.)  Before he died, the victim informed an officer on the scene that he had been shot by an individual named "Skip."  (Pet. 2.)  On October 20, 2005, Petitioner was indicted on charges of murder in the first and second degrees and criminal possession of a weapon in the second and third degrees.  (*Id.*)

### b.  Charges and trial

#### i.  Consolidation of indictments

On November 4, 2005, the State of New York filed a motion to consolidate the two indictments pursuant to New York Criminal Procedure Law sections 200.20(4) and § 200.20(2)(b)–(c), arguing that consolidation was in the public interest, that evidence of each shooting would be admissible in both trials, and that the charges were defined by the same or similar statutory provisions.  (Mot. to Consolidate Indictments, Resp. Ex. 2 at 12–16, Docket Entry No. 5.)  Petitioner's counsel opposed the motion, arguing that consolidation would deprive

Petitioner of his Sixth Amendment right to confrontation and would violate his Fourteenth Amendment right to due process. (Pet. 3.) On March 16, 2006, the Trial Court granted the motion to consolidate the indictments, holding that the indictments were joinable under New York Criminal Procedure Law section 200.20(2)(c) because the offenses charged were defined by the same or similar statutory provisions. (Memorandum dated Mar. 16, 2006, Resp. Ex. 2 at 44.)

### ii. Pre-trial hearings

The Trial Court conducted combined pre-trial hearings on November 2, December 4, December 5 and December 6, 2006, during which the investigating officers testified and Petitioner moved to suppress the victim photo identification of Petitioner that occurred at the hospital. (Pet. 8.) The following evidence was presented during the hearing.

Detective Anthony Phillips interviewed the victim in the hospital after the first shooting. (Hr'g Tr. dated Nov. 2, 2006 ("Nov. 2 Tr.") 4:3–29:10, Docket Entry No. 16.) Detective Phillips testified that the victim had identified his shooter as "Skip," a man in a relationship with Ms. Washington, and that the victim had identified Petitioner's photograph in a photographic array. (*Id.* at 8:14–14:25.)

Sergeant Steven Sauer spoke to the victim in the immediate aftermath of the second shooting, before his death. (*Id.* at 29:12–45:23.) Sergeant Sauer testified that on September 10, 2005, at approximately 1:45 AM, he responded to a call at 759 Chauncey Street in Brooklyn. (*Id.* at 30:21–31:16.) He observed the victim alone in the driver's seat of a maroon car, suffering from multiple gunshot wounds. (*Id.* at 21:17–33:13.) He described the victim as being in visible distress and in significant pain. (*Id.* at 33:5–13; 34:21–35:31; 37:20–38:6.) Sergeant Sauer asked the victim if he knew who shot him, and the victim stated that "Skip" shot him. (*Id.* at

34:10–18.)  He testified that he informed the victim that there was a high likelihood that he

would not survive his injuries.  (*Id.* at 35:4–11.)  Sergeant Sauer spoke to two civilians present at

the scene, identified only as "Peewee" and "Limbert," both of whom told Sergeant Sauer that

"Skip" was the individual who previously shot the victim on December 19, 2004.  (*Id.* at 36:1–

25.)  Sergeant Sauer then asked the victim if the shooter was the same person who had shot him

on the previous occasion, and the victim responded that he was.  (*Id.* at 37:10–19.)

Detective Jennifer Bille was one of the lead detectives in the murder case.  (Hr'g Tr.

dated Dec. 5, 2006 ("Dec. 5 Tr.") 1:12–75:20, Docket Entry No. 16.)  Detective Bille testified

that, during her investigation, she spoke to the victim's ex-wife, Tracy Stokes.  (*Id.* at 4:13–16.)

During this conversation, Stokes informed Detective Bille that an individual known as "Termite

Mike" had approached the victim and offered him twenty thousand dollars to drop the charges

against Petitioner stemming from the first shooting.  (*Id.* at. 5:17–6:6.)  Detective Bille also

testified about an interview she conducted with an individual referred to as "[W]itness [N]umber

[O]ne."  (*Id.* at 7:8–8:23.)  According to Detective Bille, Witness Number One related a

conversation he had had with Petitioner, in which Petitioner informed the witness that he was

going to "take care" of his attempted murder trial.  (*Id.* at 8:14–17.)  Detective Bille testified that

Witness Number One asked Petitioner what he meant by this, and Petitioner stated that he was

going to kill the victim.  (*Id.* at 8:18–23.)  Witness Number One informed Detective Bille that

Petitioner knew that the victim was the only witness planning to testify against him.  (*Id.* at 9:14–

23.)

After the officers completed their testimony, the Trial Court heard arguments on

Petitioner's motion to suppress the photographic identification.  After arguments, the Trial Court

rejected Petitioner's motion to suppress evidence of the photographic identification but denied

the People's request to offer direct evidence of the photographic arrays at trial. (Memorandum dated Jan. 23, 2007 ("Jan. 23 Mem."), Resp. Ex. 2 at 50–51.) The Trial Court held that the People would be permitted to offer evidence of the identification only if Petitioner's counsel "somehow . . . open[ed] the door." (Trial Tr. ("Tr.") 4:3–7, Docket Entry Nos. 16-1–16-5.) The Trial Court also found that the People had established by clear and convincing evidence that Petitioner's misconduct had caused the unavailability of the victim, and therefore held that the victim's grand jury testimony would be admissible at trial. (Jan. 23 Mem., Resp. Ex. 2 at 62–64.) The Trial Court further ruled that the victim's statement to Sergeant Sauer was not inadmissible hearsay because it qualified as a dying declaration. (Jan. 23 Mem., Resp. Ex. 2 at 52–56.)

### iii. Trial

At trial, the People called officers and detectives involved in the investigations of the December 19, 2004 and September 10, 2005 shootings to testify to the evidence gathered at both crime scenes. (Tr. 427:1–440:5, 456:22–481:20.) This evidence included four nine-millimeter shell casings discovered at the scene of the first shooting and recovered bullets and bullet impact marks in the victim's vehicle discovered at the scene of the second shooting. (Tr. 427:1–440:5, 456:22–481:20.)

Denise Hochoy, a court stenographer, read into the record the victim's grand jury testimony regarding the first shooting. (Tr. 493:12–515:17.) In this testimony, the victim stated that he knew Petitioner, that they had met a few times, and that Petitioner was Ms. Washington's boyfriend. (Tr. 500:2–25.) The victim also identified Petitioner as both "Skip" and "Deion McCrae." (Tr. 500:2–8.) The victim told the grand jury that he went to 1605 Fulton Street on December 16, 2004 in order to give Ms. Washington money for their daughter's tuition. (Tr.

498:21–501:4.)  While he was speaking to Ms. Washington, he felt something hit him in the face, at which time he turned around and saw Petitioner shooting a gun.  (Tr. 503:21–505:13.)  The victim testified that he was shot in the face, leaving a bullet lodged in his jaw and resulting in some paralysis on his left side.  (Tr. 505:17–24; 508:4–16.)

Corey Washington, Ms. Washington's uncle, testified to conversations he had had with both the victim and Petitioner.  (Tr. 612:6–728:18.)  Mr. Washington testified that he knew Petitioner, and that he had sold five guns to Petitioner, including a nine-millimeter firearm.[5]  (Tr. 621:11–623:24.)  Mr. Washington had previously been arrested for dealing drugs and was in federal custody at the time of the trial due to his involvement in illegal gun sales.  (Tr. 616:12–619:1.)  He testified that he was cooperating with federal prosecutors and providing them with information about his associates.  (Tr. 616:12–619:1; 620:19–621:10.)

Mr. Washington testified that one of his gun-dealing associates, Johnette Dowdell, was arrested by federal agents in connection with illegal gun sales.  (Tr. 628:24–629:13.)  After her release, Dowdell informed Mr. Washington that the federal government wanted information about the guns they had sold and asked him to find out whether any of the guns he had sold had been used in a crime.  (Tr. 629:18–630:22.)  In April of 2005, pursuant to his conversation with Dowdell, Mr. Washington spoke to the victim regarding the shooting in which he was injured.  (Tr. 632:18–633:1.)  Mr. Washington then spoke to Petitioner and asked him whether he had shot the victim with a gun purchased from Mr. Washington.  (Tr. 633:2–634:8.)  Petitioner stated that he had not done so.  (Tr. 634:8.)  According to Mr. Washington, Petitioner informed him that he

---

[5]  At this point of the trial testimony, the Trial Court instructed the jury that this testimony was being offered by the People as proof of the Petitioner's intent with regard to the charge of criminal possession of a weapon in the second degree.  The Trial Court instructed the jury that the evidence was not being offered and could not be considered for the purpose of proving "a predisposition to commit the crimes charged in this case."  (Tr. 623:1–15.)

"wasn't worrying" about his upcoming trial because the victim "[was] the only one who seen him shoot him" and that "he was going to finish him off." (Tr. 634:9–24.) Mr. Washington testified that he took this to mean that Petitioner was planning to kill the victim. (Tr. 634:18–24.) Mr. Washington related this conversation to the victim and told him to "lay low." (Tr. 635:7–15.)

Later that month, Mr. Washington returned to Montgomery, Alabama, where he was subsequently arrested by federal agents and brought to New York on charges of being a felon in possession of a firearm and dealing guns without a license. (Tr. 636:10–21.) He had two proffer sessions with the United States Attorney's Office, during which he related his history of criminal activities. (Tr. 642:2–648:11.) Mr. Washington testified that in September of 2005, following these two proffer sessions, he read a newspaper article about the victim's murder. (Tr. 655:12–656:1.) Defense counsel objected to the admission of the article into evidence, as it contained the line: "McCrae told emergency workers he recognized the gunman as someone who had shot him in the past" and stated that the victim was shot "by a gunman he had been feuding with." (Tr. 656:13–657:4.) The article was admitted into evidence, and the court provided a curative instruction to the jury, informing the jury that the article was not being offered for the truth of the matter asserted but rather as an explanation of the witness's thinking and the actions he took after reading the article. (Tr. 657:7–659:23.) Mr. Washington testified that, after reading the article, he spoke to Detective Rosario Rizzo from the 83rd Precinct of the New York Police Department ("NYPD") on September 29, 2005, regarding the first shooting and his conversation with Petitioner. (Tr. 659:25–661:1.)

The People elicited testimony from Mr. Washington that the federal government had agreed not to prosecute him for the other crimes to which he admitted during his proffer sessions,

in exchange for his testimony at Petitioner's trial. (Tr. 654:11–655:4.) The People also elicited testimony that the state was not bound by this agreement and that Mr. Washington was still facing federal charges related to the illegal transportation and sale of guns. (Tr. 654:11–655:8.) Mr. Washington further testified that he had not been promised a specific sentence on these charges; in fact, he faced up to ten years in prison, with his sentence remaining within the discretion of a federal judge. (Tr. 651:18–654:10.) On cross-examination, Petitioner's counsel elicited testimony that Mr. Washington knew but did not disclose information regarding the two shootings at issue during his initial proffer sessions with the government, and that Mr. Washington was only offered a cooperation agreement subsequent to his admissions related to the murder of the victim. (Tr. 664:14–728:8.)

Following Mr. Washington's testimony, the People called Detective Phillips, who testified about the investigation into the first shooting. (Tr. 771:13 –797:4.) Before trial, the Trial Court had ruled that the People would only be permitted to introduce testimony regarding the photographic array if defense counsel first opened the door by questioning the victim's ability to recognize the individual who shot him. (Tr. 4:3–7, 801:21–807:4.) After cross-examination, during which Petitioner's counsel asked Detective Phillips questions about the victim's ability to recognize his shooter, the Trial Court permitted the People to enter the photographic array into evidence and to question Phillips regarding the victim's identification of Petitioner because Petitioner's counsel opened the door as to the accuracy of the identification. (Tr. 801:21–807:4.)

Sergeant Sauer testified regarding the victim's dying declaration, in which the victim identified "Skip" as his shooter and confirmed that his shooter was the same man who had previously shot him. (Tr. 740:14–745:1.)

### c. Jury verdict and sentence

On January 29, 2007, the jury delivered a partial verdict. (Tr. 1113:9–10.) The jury found Petitioner guilty of attempted murder in the second degree and criminal possession of a weapon in the second degree, both charges stemming from the December 19, 2004 shooting. (Tr. 1117:24–1118:10.) The jury was unable to reach a verdict on the charges of murder in the first degree, murder in the second degree and criminal possession of a weapon in the second degree stemming from the September 10, 2005 shooting. (Tr. 1118:11–16.) The Trial Court declared a mistrial as to those counts. (Tr. 1121:9–10.) On April 30, 2007, taking into account Petitioner's prior felony conviction, the Trial Court sentenced Petitioner to concurrent prison terms of twenty-three years on the count of attempted murder in the second degree and fifteen years on the count of criminal possession of a weapon in the second degree. (Pet. 5.)

In March of 2007, Petitioner was retried on the murder charge, and the jury in that matter was unable to reach a verdict. (Resp. Aff. 4.) In July of 2009, Petitioner was tried a third time on the murder charge and was acquitted. (Resp. Aff. 5.)

### d. Direct appeal

On January 26, 2009, Petitioner appealed his judgment of conviction to the Appellate Division on the basis that (1) the consolidation of the indictments was improper because it allowed the People to invoke the forfeiture-by-wrongdoing doctrine in a case in which Petitioner was charged with the murder of the unavailable witness and permitted the People to introduce prejudicial evidence of the murder of the victim in the attempted murder case; (2) the admission of the victim's grand jury testimony violated Petitioner's right of confrontation, as the evidence presented at the pretrial hearings was insufficient to prove that Petitioner killed the victim with the intent of preventing him from testifying; (3) the admission of the victim's statements to

Sergeant Sauer violated the hearsay rule, as the statements did not qualify as a dying declaration; and (4) the admission of Detective Phillips' testimony regarding the victim's photographic identification constituted improper bolstering. (Petitioner's Appellate Brief ("Pet'r App. Br."), Resp. Ex. 1 at 13–14.)

On September 29, 2009, following his acquittal on the charge of murder, Petitioner moved for leave to serve and file a supplemental brief in support of his direct appeal. (Pet. 5–6.) Petitioner argued that his acquittal on the murder charge "constituted a judicial finding that the defendant did not cause the unavailability of the complainant in the first trial" and that the acquittal provided additional support for his claim that the trial court erred when it consolidated the indictments. (*See* Decision & Order dated Feb. 26, 2010 ("Feb. 2010 Decision"), Pet. Ex. 5 at 6.) On November 18, 2009, the Appellate Division denied Petitioner's motion to file a supplemental brief. (Decision & Order dated Nov. 18, 2009, Pet. Ex. 4.)

On January 12, 2010, the Appellate Division affirmed the judgment of conviction. *People v. McCrae*, 895 N.Y.S.2d 101, 103–04 (App. Div. 2010). First, the Appellate Division held that the Trial Court properly exercised its discretion in consolidating the indictments for a single trial pursuant to New York Criminal Procedure Law Section 200.20(2)(c), as both indictments charged offenses under the same or similar statutes. *Id.* at 103. Second, the Appellate Division held that the indictments would have been properly consolidated under New York Criminal Procedure Law section 200.20(2)(b) ("Section 200.20(2)(b)"), as proof of one indictment was material and admissible as evidence in the trial of the other indictment. *Id.* Third, the Appellate Division held that the victim's grand jury testimony was properly admitted, as the Trial Court determined that there was clear and convincing evidence of the defendant's involvement in the murder of the victim, and that the victim's statements to Sergeant Sauer were

dying declarations. *Id.* at 104. Finally, the Appellate Division held that Detective Phillips' testimony regarding the victim's photographic identification was properly admitted because Petitioner's counsel had opened the door to that testimony when he questioned whether the victim could reliably identify his shooter. *Id.*

The Court of Appeals denied Petitioner's request for leave to appeal the Appellate Division's decision. *People v. McCrae*, 14 N.Y.3d 842, 842 (2010).

### e. First Section 441.10 motion to vacate conviction

On December 15, 2009, Petitioner moved to vacate his conviction pursuant to New York Criminal Procedure Law, Section 440.10 ("Section 440.10"). (Feb. 2010 Decision, Pet. Ex. 5 at 5–7.) Petitioner argued that: (1) his rights to confrontation, due process, and a fair trial were violated by the admission of the victim's grand jury testimony and other prior statements under the forfeiture-by-wrongdoing doctrine; (2) the admitted grand jury testimony and dying declaration were testimonial and admitted in violation of *Crawford v. Washington*, 541 U.S. 36 (2004); and (3) his acquittal of the victim's murder constituted newly discovered evidence warranting a new trial. (*Id.* at 7.) On February 26, 2010, the court found that Petitioner's motion was procedurally barred under New York Criminal Procedure Law section 440.10(2)(a) ("Section 440.10(2)(a)"), as Petitioner's claims had already been decided by the Appellate Division. (*Id.*) Specifically, the court held that the Appellate Division's denial of Petitioner's motion for leave to file a supplemental brief constituted a decision on the merits of that claim, barring review by the court under Section 440.10(2)(a). The court further stated that, regardless, "under no stretch" of the imagination could Petitioner's acquittal, "in and of itself," constitute new evidence, and Petitioner had cited "no evidence which was unearthed between [his] first re-trial and his acquittal which would constitute newly discovered evidence." (*Id.*)

On July 22, 2010, the Appellate Division denied Petitioner leave to appeal the decision under Section 440.  (Pet. 7.)

### f.  Habeas petition

On May 26, 2011, Petitioner submitted this petition for a writ of habeas corpus. Petitioner asserts that: (1) the trial court's consolidation of two indictments violated Petitioner's right to a fair trial under the Fifth and Fourteenth Amendments; (2) the cumulative effect of the Trial Court's evidentiary rulings violated Petitioner's due process rights under the Fifth and Fourteenth Amendments, as well as his Sixth Amendment right to confrontation; (3) the trial court erred in holding that the Appellate Division had made a determination on the merits when it refused to allow Petitioner to supplement the brief he submitted in support of his direct appeal; and (4) the Trial Court erred in holding that Petitioner's acquittal of the victim's murder in a later trial did not constitute new evidence entitling him to a hearing on his motion to vacate his attempted murder conviction.  (Pet. Br. 7–8.)

### g.  Second Section 440.10 motion to vacate conviction

On August 22, 2012, Petitioner, proceeding *pro se*, moved a second time to vacate his conviction pursuant to Section 440.10.  (Pet'r 440.10 Br., Am Pet. Ex. 1 at 26.)  Petitioner argued that (1) his right to due process was violated by the State's knowing use of false or misleading testimony and the State's failure to disclose favorable evidence under *Brady*; and (2) sentencing minutes revealing the time-served sentence given to cooperating witness Mr. Washington, as well as a letter from Mr. Washington to the federal judge in his case detailing his mental health issues, constituted newly discovered evidence under Section 440.10(1)(g).  (*Id.* at 26.)

On January 22, 2013, the Supreme Court of New York State, Kings County (the "Section

440 Court") denied Petitioner's motion on two separate grounds. First, the court held that the motion was procedurally barred because Petitioner could have raised the presented claims when he filed his first Section 440.10 motion. (Decision & Order dated Jan. 22, 2013, Am. Pet. Ex. 2 at 15.) Second, the court held that his claims were meritless. (*Id.*) The Section 440 Court found that Petitioner had failed to provide factual support for his first argument, but also found that his argument was contradicted by the record. (*Id.*) The court also found that Petitioner failed to allege that the purported newly discovered evidence would change the result if the court granted a new trial. (*Id.* at 16–17.) On February 20, 2013, Petitioner moved for re-argument, and the Section 440 Court denied his motion. (Mot. for Re-argument dated Feb. 20, 2013, Am Pet. Ex. 2 at 1–10; Decision & Order dated July 3, 2013, Am. Pet. Ex. 2 at 18–20.) On July 8, 2013, the Appellate Division denied Petitioner's request for leave to appeal the decision of the Section 440 Court. (Decision & Order dated July 8, 2013, Am. Pet. Ex. 2 at 44.)

### h. Motion to amend habeas petition

On July 22, 2013, Petitioner moved to amend and supplement his habeas petition, claiming that the Section 440 Court erred when it denied both claims in Petitioner's second Section 440.10 motion as procedurally barred and meritless. (Mot. to Suppl. Pet. 1–2, 11.) The Court granted Petitioner leave to amend the petition. (Order on Mot. to Suppl. dated Oct. 1, 2013.) In a supplemental brief, Petitioner added two claims to the petition, asserting that: (1) newly discovered evidence regarding a cooperating witness revealed that the State knowingly used false or misleading testimony at trial, which violated Petitioner's right to due process; and (2) newly discovered evidence reveals that the State failed to disclose favorable evidence under *Brady*, which also violated Petitioner's right to due process. (Am. Pet. 1–2.)

## II. Discussion

### a. Standard of review

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment may only be brought on the grounds that his or her custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner is required to show that the state court decision, having been adjudicated on the merits, is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Kernan v. Hinojosa*, 578 U.S. ---, ---, 136 S. Ct. 1603, 1604 (May 16, 2016) (per curiam); *Hittson v. Chatman*, 576 U.S. ---, ---, 135 S. Ct. 2126, 2126 (Jun. 15, 2015); *Johnson v. Williams*, 568 U.S. ---, ---, 133 S. Ct. 1088, 1091 (Feb. 20, 2013).

For the purposes of federal habeas review, "clearly established law" is defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to," or an "unreasonable application of," clearly established law if the decision (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412–13. Factual determinations made by the state court are presumed to be correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**b. Consolidation of indictments**

Petitioner argues that the Trial Court's consolidation of the two indictments in this case violated his Fifth and Fourteenth Amendment rights to a fair trial and his Sixth Amendment right to confront the state's evidence against him. (Pet. 25.) This claim is meritless.

Misjoinder of offenses "rise[s] to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986); *see also McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 72 (2d Cir. 2011) ("Improper joinder of charges against a defendant does not, in itself, amount to a constitutional violation."); *Herring v. Meachum*, 11 F.3d 374, 377 (2d Cir. 1993) ("[J]oinder of offenses has long been recognized as a constitutionally acceptable accommodation of the defendant's right to a fair trial."). "Where the jury learns of multiple crimes alleged to have been committed by a defendant, '[t]he defendants' interests are protected by limiting instructions.'" *McKinnon*, 422 F. App'x at 72 (quoting *Spencer v. Texas*, 385 U.S. 554, 561 (1967)). A court must presume that the jury followed limiting instructions "unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions,' and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Mill*, 483 U.S. 756, 766 n.8 (1987) (first quoting *Richardson v. Marsh*, 481 U.S. 200, 208 (1987); and then quoting *Bruton v. United States*, 391 U.S. 123, 134 (1968)). Thus, a petitioner claiming a "due process violation based upon joinder of offenses . . . must, to succeed, go beyond the potential for prejudice and prove that *actual* prejudice resulted from the events as they unfolded during the joint trial." *Herring*, 11 F.3d at 377–78 (emphasis in original) (citing, *inter alia*, *Opper v. United States*, 348 U.S. 84, 94–95 (1954)).

Petitioner has not made the required showing of actual prejudice in this case. The jury was instructed on multiple occasions that it was to consider the two incidents at issue separately, and that evidence of one incident was not to be used to determine the Petitioner's guilt with respect to the other. During its preliminary instructions, the Trial Court instructed the jury:

> You also know that this will be two trials within one. The fact that two separate incidents are being tried together, is not a fact which any inference unfavorable to the Defendant may be drawn. Each incident will be considered by you separately. You will render separate verdicts as to each incident.

(Tr. 402:7–12.) During the jury charge, the Trial Court instructed:

> Joint trials of these two alleged incidents is a procedural convenience. Under no circumstances are you to draw any inference unfavorable to the Defendant from the fact that these two alleged incidents are being tried together. Each alleged incident must be considered by you separately. That is, the offense charged, and evidence relating to one incident, must be separately from the other. My instructions on the law must be considered by you as to each incident. And your verdict, whether guilty, or not guilty with respect to one incident, must not affect your verdict as to the other.

(Tr. 1016:11–25.)

Petitioner has not shown that the jury was unable to follow the court's instructions in this case. *See Greer*, 483 U.S. at 766 n.8. Based on these instructions, the jury had to evaluate the evidence regarding each count, and each of the shootings at issue, separately. Indeed, the jury's verdict supports a finding that it followed the Trial Court's instructions. The jury convicted Petitioner of the counts related to the December 19, 2004 shooting but was unable to reach a unanimous verdict regarding Petitioner's guilt on the counts related to the September 10, 2005 shooting. (Tr. 1117:20–1119:1.) *See Herring*, 11 F.3d at 378 (holding that a jury's verdict convicting a habeas petitioner on some counts and acquitting the petitioner of others indicated that the jury had considered the evidence as to each count separately). Petitioner is unable to satisfy his showing of actual prejudice. *See Opper*, 348 U.S. at 94–95 (holding that general

allegations of jury confusion in a multiple-defendant trial was insufficient to warrant reversal of conviction in absence of actual prejudice). Accordingly, the Appellate Division's holding that consolidation was proper in this case was neither contrary to nor an unreasonable application of clearly established law.

### c. Cumulative effect of the Trial Court's evidentiary rulings

Petitioner argues that the cumulative effect of the Trial Court's evidentiary rulings violated his due process rights under the Fifth and Fourteenth Amendments as well as his Sixth Amendment right to confront the evidence against him, and thus rendered the trial fundamentally unfair. (Pet. 32.) Petitioner argues that the Trial Court erred when it admitted: (1) the unavailable victim's grand jury testimony based on the doctrine of forfeiture by wrongdoing; (2) the unavailable victim's statements as dying declarations not subject to the bar against admitting hearsay; (3) the unavailable victim's photographic identification of Petitioner; (4) the unavailable victim's conversations with cooperating witness Corey Washington; (5) the news article relating quotes from the unavailable victim; and (6) testimony from the cooperating witness that he sold guns to Petitioner around the time of the two shootings. (Pet. 8.)

For the reasons discussed below, the Court concludes that this claim is both procedurally barred and meritless.

### i. Procedural default

A federal habeas petitioner must give the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *DiSimone v. Phillips*, 461 F.3d 181, 188 (2d Cir. 2006) (internal quotation marks omitted) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)); *see also Harris v. Fischer*, 438 F. App'x 11, 13 (2d Cir. 2011) ("[E]ach argument advanced in a federal habeas petition

must first have been exhausted through state remedies — that is, presented to the state's highest court." (citing 28 U.S.C. § 2254(b),(c))).  To prevent a habeas petitioner from exhausting his claims by simply letting the time run on state remedies, the U.S. Supreme Court "crafted a separate waiver rule — or as it is now commonly known — the procedural default doctrine." *Jiminez v. Walker*, 458 F.3d 130, 148 (2d Cir. 2006) (internal quotation marks omitted) (quoting *O'Sullivan*, 526 U.S. at 853 (Stevens, J., dissenting)).  Under the procedural-default doctrine, "when a prisoner has exhausted his state remedies but has not given the state courts a fair opportunity to pass on his federal claims," the prisoner has procedurally defaulted his claims and is ineligible for habeas relief "absent a showing of 'cause and prejudice' or 'a fundamental miscarriage of justice.'"  *Id.* (quoting *O'Sullivan*, 526 U.S. at 854).

Petitioner failed to raise the cumulative error claim in his direct appeal or in the Section 440.10 motions to vacate his conviction.  (*See generally* Pet'r App. Br.; Feb. 2010 Decision); *McCrae*, 895 N.Y.S.2d at 103–04.  While Petitioner raised certain of these alleged evidentiary errors before the state courts, he did not present a "cumulative effect" claim as he does before this Court.  *See McCrae*, 895 N.Y.S.2d at 102–04.  Petitioner could have presented this claim on direct review and provides no justification for failing to do so.  *See Jimenez*, 458 F.3d at 148–49 (holding that a petitioner's due process claim based on "cumulative trial court errors" was procedurally defaulted where the petitioner did "not give the state court fair notice of a distinct cumulative error claim").

Furthermore, Petitioner no longer has a state court avenue through which to pursue this claim.  Petitioner has already used the one direct appeal to which he is entitled under New York law.  *See* New York Court Rules § 500.20; *Jimenez*, 458 F.3d at 149.  Nor can Petitioner seek collateral review by bringing a third Section 440.10 motion, as his cumulative-error claim is a

matter of record that could have been raised on direct appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(c) (providing that the court must deny a motion to vacate a judgment when sufficient facts appear on the record to have permitted adequate review of the issue on appeal and the petitioner unjustifiably failed to raise the issue on direct review); *Grey v. Hoke*, 933 F.2d 117, 120–21 (2d Cir. 1991) (holding claim to be procedurally defaulted where petitioner no longer had "remedies available" in the New York state courts).

Because Petitioner's cumulative-error claim was not "fairly presented to the state courts," *see Jiminez*, 458 F.3d at 149, and Petitioner no longer has an avenue through which to present it, it is deemed procedurally defaulted. Furthermore, because Petitioner has not attempted to show either cause and prejudice for the default or a fundamental miscarriage of justice, he is ineligible for habeas relief on his cumulative-error claim. *See Murray v. Carrier*, 477 U.S. 478, 495–96 (1986).

### ii. Merits

Even if Petitioner's claim were not procedurally defaulted, it would nevertheless be denied because Petitioner has failed to show that the cumulative trial errors were "contrary to, or involved an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d)(1); *Johnson*, 568 U.S. at ---, 133 S. Ct. at 1091.

Because the Supreme Court has not expressly addressed whether the cumulative effect of trial errors can rise to a constitutional violation, the cumulative effect of the state court's decisions cannot be contrary to or unreasonable application of clearly established Supreme Court precedent. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."). Although the Second Circuit has

implied that cumulative errors might violate a defendant's constitutional rights,[6] the Supreme

Court has repeatedly held that "circuit precedent does not constitute clearly established Federal

law." *Glebe v. Frost*, 547 U.S. ---, ---, 135 S. Ct. 429, 431 (Nov. 17, 2014) (per curiam); *see also*

*Marshal v. Rogers*, 569 U.S. ---, ---, 133 S. Ct. 1446, 1450 (Apr. 1, 2013) (per curiam) ("The

Court of Appeals' contrary conclusion rested in part on the mistaken belief that circuit precedent

may be used to refine or sharpen a general principle of Supreme Court jurisprudence into a

specific legal rule that this Court has not announced."); *Parker v. Matthews*, 567 U.S. ---, ---, 132

S. Ct. 2148, 2155 (June 11, 2012) (per curiam) ("The Sixth Circuit also erred by consulting its

own precedents, rather than those of this Court, in assessing the reasonableness of the [state]

[c]ourt's decision.").

### d.    Rulings on motion to supplement direct appeal

Petitioner argues that the court deciding his first Section 440 motion erred when it held

that: (1) Petitioner's acquittal on the charges of murder in the first and second degrees in a later

trial did not constitute newly discovered evidence warranting a new trial; and (2) the Appellate

Division's denial of Petitioner's motion to supplement his direct appeal constituted a decision on

the merits, barring review by the trial court under Sections 440.10(2)(a) and (b).  (Pet. 36–42.)

For the reasons discussed below, the Court denies Petitioner's challenge to these rulings.

The Supreme Court has held that the Constitution does not compel states to provide post-

conviction proceedings for relief.  *See Lackawanna Cty. Dist. Att'y v. Coss*, 532 U.S. 394, 402

(2001) (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987)).  Thus, the Second Circuit, like its

---

[6] *See Jiminez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) (finding cumulative-error claim to be procedurally defaulted); *Floyd v. Meachum*, 907 F.2d 347, 353–57 (2d Cir. 1990) (addressing the cumulative effect of a prosecutor's remarks during summation on a defendant's right to fair trial); *United States v. Alfonso-Perez*, 535 F.2d 1362 (2d Cir. 1976) (reversing a criminal conviction on direct appeal as a result of cumulative trial errors).

sister courts, has concluded that "alleged errors in a post-conviction proceeding are not grounds for § 2254 review." *Word v. Lord*, 648 F.3d 129, 132 (2d Cir. 2011); *see also Jones v. Duncan*, 162 F. Supp. 2d 204, 217 (S.D.N.Y. 2001) (holding that petitioner's claim that trial court violated due process by denying, *inter alia*, his 440.10 motions without holding a hearing was not cognizable on habeas review). Because Petitioner is challenging the proceedings of state collateral review, rather than the judgment that provides the basis for his incarceration, his claim is not cognizable on habeas review.

The Court therefore concludes that Petitioner is not entitled to relief on this claim.

    **e.   Newly discovered evidence**

Petitioner's final two claims are based on what he characterizes as "new evidence" regarding cooperating witness Mr. Washington, which consists of: (1) a time-served sentence Mr. Washington received in federal court after testifying in Petitioner's third trial, and (2) a letter to the federal judge in Mr. Washington's case that Petitioner asserts details Mr. Washington's mental illness. (Am. Pet. 1–2.) Petitioner argues that he sought disclosure of information pertaining to Mr. Washington's sentencing shortly after Petitioner's conviction and first Section 440.10 motion, but the Brooklyn District Attorney's office reported that no such information existed. (*Id.*) Petitioner argues that Mr. Washington testified — and the prosecutor argued in summation — that the Brooklyn District Attorney's office had made him no promises in exchange for his testimony and that, despite Mr. Washington's cooperation agreement with federal prosecutors, he did not know the sentence he would be assigned in his federal criminal trial. (*Id.* at 5.) Petitioner alleges that the new evidence reveals that two due process violations

occurred at his trial: (1) the People knowingly used false or misleading testimony; and (2) the People failed to disclose favorable evidence to the defense in violation of *Brady*.[7]  (*Id.* at 20–29.)

Newly discovered evidence is evidence that "could not with due diligence have been discovered before or during trial."  *United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992).  "A claim 'based on newly discovered evidence ha[s] never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.'"  *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)); *see also Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("[T]he existence merely of newly discovered evidence relevant to the guilt of state prisoner is not a ground for relief on federal habeas corpus."), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992); *Rustici v. Philips*, 497 F. Supp. 2d 452, 466–67 (E.D.N.Y. 2007), *aff'd*, 308 F. App'x 467 (2d Cir. 2009); *Ortiz v. Woods*, 463 F. Supp. 2d 380, 394 (W.D.N.Y.2006) ("[A]n independent constitutional violation . . . is a prerequisite for bringing a colorable claim based on newly discovered evidence.").

Here, Petitioner argues that two constitutional violations occurred in the underlying criminal proceeding — the first for prosecutorial misconduct based on knowing use of false or misleading testimony, and the second for a *Brady* violation.

Petitioner relies on two documents as "new evidence" that entitles him to habeas relief. The first document is a letter from Mr. Washington to the federal district court judge presiding over Mr. Washington's criminal case.  (Washington Letter to Judge Frederic Block

---

[7]  The State did not respond to Petitioner's arguments regarding the new evidence.

("Washington Letter"), Am. Pet. Ex. 1 at 3.) The federal judge received the letter on July 21,

2008, and in it Mr. Washington wrote:

> I thank the United States government for the reality check. I have
> been seeing a psychiatrist which has been given [sic] me 4 different
> medications to comprehend what is going on in my mind; and also
> I have been seeing a psychologist for 38 months and this has help
> [sic] me deal with all the trouble that is occurred in my life.

(*Id.*) The second document is a transcript of Washington's sentencing hearing before the same

judge on June 26, 2009. (Washington Sentencing Tr., Am. Pet. Ex. 1 at 4–16.) The transcript

reflects that, during the hearing, the prosecutor informed the court that "[a]s of yesterday Mr.

Washington testified for the third time in the state court first degree murder [trial of Petitioner]."

(*Id.* at 5.) The prosecutor then said, "[s]o as represented, Mr. Washington has now fulfilled

everything we've asked of him." (*Id.*) The judge responded, "[l]et's process this because I

indicated I'm going to give him time served. So why don't we just go through it and just deal

with the substance of things. Okay?" (*Id.* at 6.)

On December 15, 2009, Petitioner moved for the first time to vacate his conviction

pursuant to Section 440.10 but did not raise due process claims based on the newly discovered

evidence. (Feb. 2010 Decision, Pet. Ex. 5 at 5–7.) That motion was denied on February 26,

2010. (*Id.*) On August 22, 2012, Petitioner, proceeding *pro se*, moved a second time to vacate

his conviction pursuant to Section 440.10, this time raising his due process claims based on the

newly discovered evidence that arose at Mr. Washington's sentencing. (Pet'r 440.10 Br., Am

Pet. Ex. 1 at 26.) On January 22, 2013, the New York Supreme Court denied Petitioner's motion

on two separate grounds. First, the court held that it was procedurally barred because Petitioner

could have raised both grounds when he filed his first Section 440.10 motion. (Decision &

Order dated Jan. 22, 2013 ("Jan. 2013 Decision"), Am. Pet. Ex. 2 at 15.) Second, the court held

that his claims were meritless. (*Id.*) The court found that Petitioner failed to provide factual

support for his first argument — that the State had failed to disclose Mr. Washington's cooperation agreement and the potential that he would receive a lenient sentence. (*Id.*)  The court noted that the record refuted Petitioner's argument. (*Id.*)  At Petitioner's trial, Mr. Washington had not yet been sentenced, but Mr. Washington's plea agreement with the government was turned over to the defense and was used on cross-examination to undermine Mr. Washington's credibility. (*Id.*)  As to Petitioner's second argument, that Mr. Washington's letter to the sentencing court in 2009 newly revealed Mr. Washington's "history of mental illness," the court concluded that Petitioner had not shown that the letter would "change the result if a new trial is granted." (*Id.* at 16–17 (quoting *People v. Salemi*, 309 N.Y.2d 208, 215–16 (1955), *cert. denied*, 350 U.S. 950 (1956)).)

Petitioner argues that the court deciding his second Section 440.10 motion incorrectly held that his due process claims were procedurally barred because he could have raised them during his first Section 440.10 motion. (Am. Pet. 11.)  Petitioner asserts that he was unable to raise his due process arguments in his first Section 440.10 motion because, although he continuously attempted to acquire documents relating to Mr. Washington's sentencing leading up to his first Section 440.10 motion, he was unable to acquire them until December 21, 2010 — approximately one year after Petitioner filed his first Section 440.10 motion. (*Id.*)  Although Petitioner does not append evidence of his attempts to acquire files related to Mr. Washington's sentencing, he does append a letter from the Clerk of Court dated December 21, 2010, providing him with the requested files from the federal courts' Archive Record Center. (*See* Am. Pet. Ex. 1 at 2.)  Because Petitioner disputes the facts surrounding the procedural bar and Respondent has not raised procedural bar as a defense to Petitioner's newly discovered evidence claims, the Court considers Petitioner's newly discovered evidence claims on the merits.  Where, as here,

the state court's decision rested alternatively on the merits of a petitioner's claims, the federal district court reviews the decision under the standard of AEDPA deference. Thus, Petitioner must show that the Section 440 Court's decision is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Kernan*, 578 U.S. at ---, 136 S. Ct. at 1604.

### i. Knowing use of false or misleading testimony

To challenge a conviction because of a prosecutor's knowing use of false testimony, "a defendant must establish that (1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Helmsley*, 985 F.2d 1202, 1205–06 (2d Cir. 1993) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

Petitioner has not demonstrated that Mr. Washington provided false testimony, and therefore cannot demonstrate that the State knew or should have known Mr. Washington's testimony was false. As the Section 440 Court noted in denying Petitioner's motion on the merits, the State did not know what sentence Washington would receive until after he testified in Petitioner's third trial. (Jan. 2013 Decision, Am. Pet. Ex. 2 at 16–17.) This determination was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and it was not based on an unreasonable determination of the facts from the Trial Court proceeding. *See* 28 U.S.C. § 2254(d). Mr. Washington testified at trial that he was cooperating with the federal government and that he had not been promised a specific sentence by the federal judge in his case. (Tr. 636:10–21, 651:18–655:8.) Petitioner had received the plea agreement between Washington and the federal government, and Petitioner's trial counsel cross-examined

Washington on the terms of the plea agreement.  (Jan. 2013 Decision, Am. Pet. Ex. 2 at 15.)  The record contains no evidence that the federal judge promised Washington a specific sentence prior to his testimony in Petitioner's first trial or that the State was aware of the sentence Washington would eventually receive.  As for Washington's mental health, neither the State nor defense counsel asked Washington whether he was in therapy or on medication during the course of the trial.  Therefore, the witness could not and did not give false testimony regarding his mental health status, and the record contains no evidence that the State was aware of any mental health issues suffered by Washington.

Furthermore, even if the prosecution had knowingly permitted Washington to testify falsely regarding his sentence and to omit information about his mental health, such testimony likely would not have affected the outcome of the trial.  Washington testified and was cross-examined at length about his personal criminal history and his decision to cooperate with the prosecution.  Petitioner does not show a reasonable likelihood that evidence regarding Washington's specific sentence or mental health status, had it been available at the time, would have altered the jury's decision.  (*See* Jan. 2013 Decision, Am. Pet. Ex. 2 at 16.)

### ii.    Failure to disclose favorable evidence under *Brady*

Petitioner argues that the State's failure to disclose evidence of Washington's sentence and medications violated *Brady* and, by extension, Petitioner's right to due process.  (Am. Pet. 1–2, 11.)

In a criminal prosecution, the government has a constitutional obligation to disclose material, exculpatory evidence to the defendant.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Under *Brady*, "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment."  *United States v.*

*Cacace*, 796 F.3d 176, 183 (2d Cir. 2015) (quoting *United States v. Coppa*, 276 F.3d 132, 139 (2d Cir. 2011)); *see United States v. Amiel*, 95 F.3d 135, 144 (2d Cir. 1996) (noting that a *Brady* violation occurs where "(1) the government failed to disclose favorable evidence; and (2) the undisclosed evidence was material"). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Fuentes v. T. Griffin*, 829 F.3d 233, 246 (2d Cir. 2016) (internal quotation marks omitted) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A "reasonable probability" of a different result exists where the nondisclosure "undermines confidence in the outcome of the trial." *Fuentes*, 829 F.3d at 246 (internal quotation marks omitted) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995))).

Mr. Washington was sentenced following his testimony in Petitioner's third trial, two-and-a-half years after the conviction from which Petitioner seeks habeas relief. The plea agreement between Mr. Washington and the federal government was made available to Petitioner's counsel at trial, (*see* Jan. 2013 Decision, Am. Pet. Ex. 2 at 15), and Petitioner presents no evidence that the State was aware of the sentence that Mr. Washington would receive at that time. As the Section 440 Court noted, "[t]here was no detail of the plea agreement that was undisclosed by the People when Washington testified." (*Id.*) Accordingly, there is no indication in the record that the People failed to disclose information in violation of *Brady*. Even assuming the People had known that Mr. Washington would receive a time-served sentence, the jury repeatedly was made aware of Mr. Washington's decision to cooperate and the fact that the cooperation agreement was issued only following his proffer regarding the facts of Petitioner's case. (Tr. 636:10–21, 651:18–655:8, 664:14–728:8.) Petitioner did not provide the Section 440 Court with any evidence that would have led it to conclude that disclosure of the time-served

sentence Washington eventually received — had it been available at the time of trial — was "material either to [Petitioner's] guilt or punishment," *Cacace*, 796 F.3d at 183, particularly where the jury was aware that Mr. Washington likely would receive a lenient sentence as a result of his cooperation. *See also Kyles*, 514 U.S. at 434. Accordingly, the Section 440 Court was not unreasonable to conclude that Mr. Washington's sentence did not constitute new evidence.

Mr. Washington's letter to Judge Block similarly was written and filed after Petitioner's trial and verdict. (Washington Letter, Am. Pet. Ex. 1 at 3.) First, Petitioner has not provided the Court with evidence that Mr. Washington was, in fact, in the care of mental health professionals or on medication at the time of the trial, so it is not clear that Mr. Washington's letter reflects a true fact that the State could have disclosed under *Brady*. The jury heard lengthy testimony regarding Mr. Washington's life and his criminal history, (Tr. 636:10–21, 651:18–655:8), during which time Petitioner's trial counsel had the opportunity to cross-examine Mr. Washington. To the extent that Mr. Washington was on medication or experiencing mental health issues at the time of the trial, that information would not qualify as "newly discovered evidence" because it was in existence at the time of trial and could have been obtained by defense counsel by eliciting testimony from Mr. Washington on the stand. *See, e.g.*, *Herrera*, 506 U.S. at 400; *Townsend*, 372 U.S. at 317 (holding that newly discovered evidence is evidence "which could not reasonably have been presented to the state trier of facts"); *cf. United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) (holding that a relevant factor in identifying new evidence under Fed. R. Crim. P. 33 is whether counsel could have "discovered the evidence with due diligence before or during trial"); *Helmsley*, 985 F.2d at 1206 ("A post-trial motion under Fed. R. Crim. P. 33 based on newly discovered evidence must be supported by evidence 'discovered after trial . . .

that . . . could not, with the exercise of due diligence, have been discovered sooner.'" (citation omitted)).

In addition, Petitioner presents no evidence that, at the time of the trial, the People were aware of any mental health issues Mr. Washington may have been suffering, or that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Fuentes*, 829 F.3d at 246 (internal quotation marks omitted) (quoting *Bagley*, 473 U.S. at 682).

Because the decision of the Section 440 Court as to Petitioner's newly discovered evidence claims was neither contrary to nor an unreasonable application of federal law and is supported by the facts in the state court proceedings, the Court denies Petitioner's due process claims based on newly discovered evidence.

### III. Conclusion

For the foregoing reasons, the Court denies Petitioner's motion for a writ of habeas corpus. Because Petitioner has not made a substantial showing of the denial of any constitutional right, no certificate of appealability will issue. *See* 28 U.S.C. § 2253; *see also Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 112–13 (2d Cir. 2000). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962). The Clerk of Court is directed to close the case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: April 7, 2017
      Brooklyn, New York